[Cite as *State ex rel. Scott v. Indus. Comm.*, 2016-Ohio-3525.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Rhoulac Scott, | : | |
| Relator, | : | |
| v. | : | No. 14AP-894 |
| Industrial Commission of Ohio and LaGanke & Sons Stamping Co., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on June 21, 2016

**On brief:** *Duane E. Cox,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

IN MANDAMUS

BROWN, J.

{¶ 1} Relator, Rhoulac Scott, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order denying his application for an additional award for violation of a specific safety requirement and to enter an order granting the application.

{¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the attached decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. No objections have been filed to that decision.

{¶ 3} As there have been no objections filed to the magistrate's decision, and it contains no error of law or other defect on its face, based on an independent review of the file, this court adopts the magistrate's decision as its own. Relator's request for a writ of mandamus is denied.

*Writ denied.*

TYACK and KLATT, JJ., concur.

_____

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Rhoulac Scott, | : | |
| Relator, | : | |
| v. | : | No.  14AP-894 |
| Industrial Commission of Ohio and LaGanke & Sons Stamping Co., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

#### Rendered on February 11, 2016

---

*Duane E. Cox,* for relator.

*Michael DeWine,* Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

---

### IN MANDAMUS

{¶ 4}   In this original action, relator, Rhoulac Scott, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying his application for an additional award for violation of a specific safety requirement ("VSSR"), and to enter an order granting the application.

Findings of Fact:

{¶ 5}   1.   On October 19, 2011, relator suffered the partial traumatic amputation of three fingers of his right hand while operating a power press in a factory owned and operated by respondent, LaGanke & Sons Stamping Co. ("respondent" or "LaGanke Stamping").   On the date of injury, relator was employed by a temporary employment

agency that sent him to work at LaGanke Stamping which was owned by Charles LaGanke ("LaGanke"). The accident occurred shortly after LaGanke had trained relator on the use of pullback guards to be used in the operation of the power press.

{¶ 6} 2. The industrial claim was allowed and assigned claim number 11-358253.

{¶ 7} 3. On August 21, 2012, relator filed an application for a VSSR award. The VSSR application prompted an investigation by the Safety Violations Investigative Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 8} 4. On November 6, 2012, the SVIU investigator conducted an onsite visit at the LaGanke Stamping factory where the injury had occurred. The investigator met with LaGanke and his attorney. The investigator photographed the press involved in the injury and obtained documents. LaGanke Stamping also submitted its own photographs of the press.

{¶ 9} 5. On December 5, 2012, the SVIU investigator issued a report containing eight enumerated paragraphs. The report states:

> [Two] * * * The press identified by the employer was a full revolution press, manufactured by [Minster] Machine Company of Minster, Ohio * * * which is capable of punching and cutting material. The press is powered and equipped with an electric motor. Although the employer is unsure of the exact press purchase date, Mr. [LaGanke] believes it was purchased sometime in the 1950's. The press is actuated by means of a foot pedal. Mr. Laganke advised there was not an emergency stop button located on the press. It was further advised no modifications were made to the press prior to or since the incident.
>
> [Three] * * * On the day of the incident Mr. Laganke described he was demonstrating the press and pull backs to claimant Scott. Mr. Laganke stated once he believed claimant Scott understood the safe operation of the press he (Laganke) set up the pull backs. It was further advised by Mr. Laganke he had to go to his office for a pen so the daily pull back inspection sheet could be completed. Prior to Mr. Laganke returning from his office to the press, the claimant sustained his injuries. It is believed by Mr. Laganke that when he went to the office to retrieve a pen, claimant Scott went to the restroom. Once the claimant returned to the press he incorrectly placed the pull backs onto his hands * * *. Mr. Laganke stated since the incident occurred prior to him returning from his office he never had an opportunity to

document his pull back check of the press and claimant Scott * * *.

[Five] The involved Minster #6 press was not equipped with a fixed barrier guard, gate guard, two hand control, restraint or hold back guards; it was equipped with pull backs. Investigator Luker asked if the press was equipped with any other means which would provide safeguards, preventing hands or fingers of the operator from entering the danger zone during operating cycle and which are equivalent to fixed barrier guard, gate guard, two hand control, restraint or hold back guard; it was equipped with pull backs. Mr. Laganke replied it was equipped with pull backs (also known as pull guard).

[Six] Mr. Laganke expressed he was the main person who would inspect the press on a weekly and monthly basis. The pull backs were inspected on a monthly basis and each time an operator would run a press * * *. The logs provided by Mr. Laganke were dated with the day and month, but the year was not noted.

[Seven] Mr. Laganke stated claimant Scott was hired on October 19th, 2012 as a temporary worker from Lakeland Employment Group. Claimant Scott was injured on his first day on the job, as reported by Mr. Laganke. It was stated by Mr. Laganke he believed claimant Scott had over twenty years of experience operating presses. Claimant Scott named three or four companies he worked at operating presses, stated Mr. Laganke. Mr. Laganke stated he demonstrated operation of the press to claimant Scott, including proper use of the pull backs. Next Mr. Laganke had claimant Scott demonstrate the press operation and pull backs to confirm he understood. Finally he verbally quizzed claimant Scott on the operation of the press, stated Mr. Laganke. Mr. Laganke believed claimant Scott understood the safe use of the pull backs. Claimant Scott was verbally advised if he had issues with a press or pull backs he was to notify Mr. Laganke or another employee.

[Eight] Investigator Luker was scheduled to obtain an affidavit from Rhoulac Scott Jr. October 30th, 2012, at the office of Attorney Duanne Cox. On October 29th Investigator Luker received a phone call from Attorney Cox stating the claimant was unable to make the scheduled meeting. Investigator Luker rescheduled the affidavit for November 7th, 2012 at the office of Attorney Cox. November 7th, 2012 Investigator Luker received another phone call

from Attorney Cox stating Claimant Scott will not be available for the scheduled meeting. Investigator Luker advised Attorney Cox the VSSR report will be submitted without the affidavit from claimant Scott.

{¶ 10} 6. The SVIU report enumerates and describes ten exhibits. Exhibit No. 2 is a letter from LaGanke to the SVIU investigator dated November 15, 2012. The letter states:

> I am sending a signed statement by the other press operator that day, John Wronski, who also saw me giving instruction and checking the pull-back guard for Rhoulac Scott Jr. the day of the accident.
>
> Both John and Allen Coleman admitted they had seen me at the press with Rhoulac while they were operating presses F10 and F11 just down the aisle from the accident that occurred at F3.

{¶ 11} 7. Exhibit No. 3 of the SVIU report contains three reports from LaGanke Stamping. The first report is a one-page report from LaGanke dated November 17, 2011:

> REPORT OF A PRESS ACCIDENT:
>
> Rhoulac Scott, a temporary employee from Lakeland Labor located in Cleveland, Ohio.
>
> During operation of a press, his second and third fingers were lost to the first joint, and to the second joint of his fourth finger, all on his right hand. The information of his loss was from a phone conversation with Mr. Scott while he was in the hospital.
>
> It was a full revolution press.
>
> The safeguard was a two hand pullout.
> The failure appears to be Mr. Scott did not put the wrist strap on properly shortly after beginning work. Instead of having the strap around his whole hand as instructed, he had it around just the thumb, which allowed almost a 4 inch greater reach into the closed die. Mr. Scott claimed to have been an experienced press operator of twenty years, and having worked with pullouts many times. After a demonstration of the use and proper wearing of the pullouts, he demonstrated putting them on without error.

The feeding used was hands in the die and foot trip.

One operator ran the press alone.

{¶ 12} The second report is a one-page report from Allen Coleman dated October 21, 2011:

Accident that occurred 10/19/2011 to Rhoulac Scott as reported by Allen Coleman;

I heard yelling and went to see what it was about when I witnessed Rhoulac Scott standing by the press waving his right hand in the air screaming for help. Charles LaGanke went to help him so I did not.

Shortly after Rhoulac was gone, I assisted Charles LaGanke with his investigation of the accident. We could find nothing wrong with the press or the pull back devise [sic]. After we both could not figure out what had happened, it finally occurred to me he must have had the wrist strap on wrong, just around his thumb and not the whole hand. That allows you to reach into the press even when the press is down.

{¶ 13} The third report is a two-page report from LaGanke dated October 21, 2011:

Accident that occurred 10/19/2011 to Rhoulac Scott as reported by Charles H. LaGanke:

After Rhoulac Scott arrived from Lakeland Labor to run a Punch Press, I quizzed him on his knowledge and experience in operating a Punch Press which he claimed to have run for years. He assured me he had been running presses for over 20 years and appeared to completely understand all that I showed him. When I asked where, he listed several stamping houses including one just around the corner. I [then] proceeded to demonstrate the use and proper wearing of the wrist strap and how to place the part in the [gauge]. I ran about 1 to 2 dozen parts so he could see how it is done and how the machine operates. I [then] watched as he tried on the wrist straps while I explained how to place the first four fingers completely through both straps, making sure the thumb only goes through the first strap so the first strap portion is around your entire hand and pulls back between the thumb and first finger, which I demonstrated. He could take them on and off properly without my assistance, claiming he had worked with them many times. I [then] checked the adjustment with a part in and the press down to 1/2 inch from the part, it pulled his hand back over an inch at

that point. I proceeded to run the press around, when forming the part nothing stuck out past the die. He [then] ran over a dozen parts while I looked on. I warned him I would have to fire him if I saw him run the press just one time without the pull back device as that was critical. He said he understood and that would not be a problem. I also mentioned to watch for anything suspicious, such as a bolt on the floor, suspicious noise, press repeat, anything loose, etc., and to come and get me if he did. I [then] left after telling him I would return shortly to see how he was doing.

About ten minutes after leaving Rhoulac the accident occurred. I heard yelling and ran over his direction to see him strapped in the press with his hand bleeding and him yelling out. I quickly disconnected him and yelled for another employee to take him to the hospital, as I figured that would be faster than waiting for an ambulance. I did not thoroughly observe how he was strapped in, I just wanted to get him to the hospital, and I was too panicked to think too calmly.

After he was gone, another employee, Allen Coleman, and I went over the pull back device to see what had happened. I had to replace the wrist strap as I had left that on Rhoulac when he was taken to the hospital. The pull back functioned every time and nothing appeared wrong. There was a large portion of the part bent and protruding when Rhoulac was injured, so I climbed a ladder and hung on the pull back device to see if the part could have flexed the pullback and held him in, but it did not flex at all with all my weight on it. Allen Coleman did point out the one possibility, if you put the wrist strap on incorrectly with the strap that goes around your hand around just your thumb instead, it allows you enough distance to get your fingers in the press when closed. This would appear to be the only logical explanation.

Without having to make any adjustments except replacing the wrist strap Rhoulac took, I ran the remainder of the parts without any incident, the pull back device functioned as expected.

On 10/19/2011 I sent for a temporary worker from Lakeland Labor at 7:00 to run a punch press. It was for die #28FA14, which was a forming operation, striking .060 thick steel. Upon going through my normal instructions and a demonstration of wearing a pullback, the press operator appeared to be unqualified even though he claimed experience. I immediately removed him from running any punch presses and called Lakeland saying I would only use

an experienced press operator. They told me they had just the man available with a lot of experience.

Rhoulac Scott Jr. arrived at about 10:30. When I quizzed him he said he had worked running presses for over 20 years and could list at least three companies I recognized including one nearby. He also said he had used hand pullouts many times. He appeared intelligent and alert.

At the press I demonstrated the proper wearing of the pullbacks, telling him any other way of wearing them is illegal. He demonstrated putting them on properly, and while they were on I jogged the press around to make sure his hand could not get caught in the press, with or without a part inside, especially at the pinch point which I checked at about 1/2 inch gap. I have the operator push hard to make sure they cannot be closer than 2", even if he fell in towards the press. The press was at the proper location for him and needed no adjustments.

I then had him remove the pullbacks and put them on myself to demonstrate the proper running of the job and how to put pullbacks on once again. I ran about thirty parts, taking from one bin to stack on the press, and then running and tossing them into another bin on my left. I explained the bin needs to be close enough to reach parts without having to remove the pullbacks, he agreed. He then properly put the pullbacks on and ran some parts as I observed. I had also told him to come and get me if he noticed any strange noise or [if] something came loose or a bolt fell on the floor, as that could be serious. He was also warned I did not give any second warnings about the pullbacks, if I saw him running the press just once without using them he would be terminated. For safety we also keep records for each press of weekly press and monthly pullback inspections per OSHA approved procedures along with lock out tag out instructions. After about five minutes of watching him run the press, I went to the office to get a pen to sign him in. It was about 10:50, and I could hear a lot of yelling. I rushed out and saw Rhoulac still attached to the press waving his right hand in the air. I rushed to him and disconnected the cable snap from his wrist strap. On the way I yelled at another employee to get Rich Starman to drive him to the hospital. I escorted Rhoulac to the office door where Rich was washing his hands and I ran in to get some clean white towels to wrap his hand. He then left with Rich with the wrist strap still attached.

I then went to the press to investigate. I removed a bent part and attached another wrist strap. I tried bringing the press down to see what could have happened. The pullback adjustment was still good, so I checked to see if the pullback frame could flex and allow his hand to remain in the form die as it closed. I climbed a ladder and hung from the frame, it would not flex. At this point I could not readily understand what could have happened and I asked another experienced operator, Allen Coleman, for his opinion. Together we looked over everything and could find nothing wrong with the device or the adjustment. The only explanation we could find was that he had put the wrist strap on improperly, with the strap portion that was to go across the hand going around the thumb instead. When I tried wearing it this way I was able to get some of my fingers in at an angle at the pinch point, similar to the injury he had sustained. I then put the pullback on properly and finished running the bin without any problems.

{¶ 14} 8. Exhibit No. 7 of the SVIU report is a one-page document captioned "OSHA's Form 301, Injury and Illness Incident Report."  The document is a form provided by the U.S. Department of Labor, Occupational Safety and Health Administration.  On October 21, 2011, LaGanke completed the form.  In response to the query "What happened? Tell us how the injury occurred," LaGanke responded:  "The worker was wearing pull backs when he stepped on the pedal with his hand in the press and was not pulled out. Appears to have put wrist strap on incorrectly."

{¶ 15} 9. Exhibit No. 8 of the SVIU report is a one-page document captioned "Pullout Adjustment Record."  Under the caption, the following instructions are given:

Set-up man must record each adjustment made to the safety device on all jobs run in this press. BOTH set-up man AND operator must initial each recording.

(Emphasis sic.)

{¶ 16} Thereunder are vertical columns for the "date," "time," "die setter," and "operator."  It can be observed that there is only one entry for the date of October 19, 2011, which is the date of injury here.  "7:25" is entered as the time which precedes the time of relator's arrival at LaGanke Stamping.  Also, the operator is identified as "GR," which is not the initials of relator.

{¶ 17} It is undisputed that LaGanke did not enter the requested information relating to the industrial injury at issue here.  The reason for that undisputed fact is disclosed later in this magistrate's decision.

{¶ 18} 10.  As indicated earlier, the SVIU investigator did not receive an affidavit from relator prior to the issuance of the SVIU report.

{¶ 19} 11.  The record contains three reports dated April 12, May 17, and June 4, 2013, authored by Richard E. Harkness, Ph.D., who is said to be relator's expert.  It is not entirely clear from the stipulated record when the three reports of relator's expert were filed.

{¶ 20} 12.  On August 14, 2013, relator's VSSR application was heard before a staff hearing officer ("SHO").  The hearing was recorded and transcribed for the record.

{¶ 21} At the hearing, initially, counsel for LaGanke Stamping told the SHO that he "was handed an expert report that wasn't filed and wasn't provided to me."  (Tr. 4)

{¶ 22} 13.  The announcement of counsel for LaGanke Stamping prompted the following exchange:

> THE HEARING OFFICER: Which expert report?
>
> MR. REIDY: The expert report dated May 17, 2013 by Mr. Harkness.
>
> THE HEARING OFFICER: It was filed.
>
> MR. REIDY: Okay. It wasn't provided to me.
>
> THE HEARING OFFICER: Well, it was filed. It hadn't been scanned, though. It was brought to me and placed in the file.
>
> MR. COX: The same day I mailed it to the employer after I had got the stamp, the date stamp, I did mail it to the employer. That must have been last week sometime ago.
>
> THE HEARING OFFICER: When did you receive it?
>
> MR. REIDY: Today. It was just handed to me.
>
> THE HEARING OFFICER: You never received it prior?
>
> MR. REIDY: No, we did not.

> THE HEARING OFFICER: You said you mailed it to the employer. Did you mail it to Mr. Reidy?
>
> MR. COX: No, I mailed it to the employer's representative, Ross Brittain.

(Tr. 4-5.)

{¶ 23} 14. After the SHO asked counsel whether he was requesting a continuance, counsel discussed the matter with LaGanke and then informed the SHO that LaGanke Stamping would go forward with the hearing.

{¶ 24} 15. The April 12, 2013 Harkness report consists of one page, stating:

> Please be advised that I consider Mr. Scott's employer has violated the following VSSR's:
>
> [One] 4121:1-5-10(D)(1)(a)
>
> The employer failed to properly adjust the pullback (pull-out) davice [sic] which is a point of operation device.
>
> [Two] 4121:1-5-10(C)(3)(a)
>
> The employer demonstrated the operation of the press by leaving his foot continuously under the foot pedal guard instead of removing it after each press stroke. This is tantamount to removing the guard and thus does not prevent unintended operation.
>
> Further, the employer did not specifically instruct Mr. Scott to remove his foot from under the guard after each press stroke and to place his foot on the foot pedal only after each hand was clear of the point of operation.

{¶ 25} 16. The May 17, 2013 Harkness report consists of seven type-written pages followed by several exhibits identified as exhibits I through V.

{¶ 26} Exhibit No. I of the May 17, 2013 Harkness report is the OSHA form 301 completed by LaGanke, as previously noted.

{¶ 27} Exhibit No. II of the May 17, 2013 Harkness report is an affidavit executed by relator. The affidavit is improbably dated May 7, 2007. The affidavit avers, at paragraphs 1 through 11:

[One] Now comes the affiant and states that on or about October 19th, 2011, he was hired as a temporary worker at the LaGanke and Sons Stamping Company.

[Two] That he was referred there by Lakeland Employment Group of Cleveland.

[Three] That he was assigned to operate a punch press machine.

[Four] That he was given limited instructions by the foreman and owner, Mr. LaGanke.

[Five] That Mr. LaGanke instructed Mr. Scott while himself sitting at the stamping machine.

[Six] That Mr. LaGanke instructed Mr. Scott on the operation of the machine while maintaining his foot on the pedal.

[Seven] That affiant was later sitting at the machine and given further limited instructions as to the use of the pullback mechanism.

[Eight] That affiant pullback were never adjusted for his arm length or safety by the foreman or Mr. LaGanke. [sic]

[Nine] That Mr. LaGanke did not instruct him to remove his hands from the die area before inserting his foot under the foot switch guard and placing his foot on the pedal.

[Ten] Mr. LaGanke left the machine area and gave no further instruction to the affiant.

[Eleven] That after processing material for approximately 20 minutes the machines [sic] pullback did not operate so that the machine amputated [sic] fingers of affiant's right hand.

{¶ 28} Exhibit III of the May 17, 2013 Harkness report is the first page of the October 21, 2011 report of LaGanke as previously noted.

{¶ 29} Exhibit IV presents four pages from a document captioned "Instruction Manual, How to ADJUST and MAINTAIN the Possons Device for MAXIMUM SAFETY." (Emphasis sic.)  The cover page of the document indicates that the instruction manual was issued in June 1968 by "The Positive Safety Mfg. Co." of Eastlake, Ohio.

{¶ 30} The second page of the instruction manual provides:

**IMPORTANT**

FINGER CLEARANCE SHOULD BE CHECKED:

*(1) At the beginning of every shift.*
*(2) Each time a different operator is placed on the job.*
*(3) Each time a different die is installed.*

(Emphasis sic.)

{¶ 31} The third page of the instruction manual offered by relator's expert is actually page five of the instruction manual. Page five of the instruction manual provides:

**Finger Clearance**

Fasten the wrist bands on the hands of the person who is to operate the press and connect them to the pull-back cords. * * * Unlock the hex nut "A" on the shaft of the cable storage reel and, by means of the cable adjusting handle "B", wind the cable in (or out) as required to provide *only* enough cord for the operator to comfortably place the part in the die. *No more reach should be allowed.*

(Emphasis sic.)

{¶ 32} The fourth page of the instruction manual offered by relator's expert is actually page six of the instruction manual. Page six of the instruction manual provides:

Finger clearance should be checked with the work in the die. With the power off, the operator's hands should be extended to each side of the die and the press turned over slowly by hand until there is an opening of not less than 3/4" between the lower edge of the punch and the top of the die or work, whichever is higher. Now, with fingers extended toward the die, there must be a distance of at least 3" from finger tips to the pinch point.

{¶ 33} Returning to the body of the seven-page May 17, 2013 Harkness report, at pages six and seven, the Harkness report offers six conclusions:

Based on a reasonable degree of engineering certainty, I conclude as follows:

[One] Mr. Scott was seriously injured when he inadvertently actuated the foot pedal while his hand was in the die area.

> [Two] The pullbacks were not properly adjusted for Mr. Scott, thus violating [Specific Safety Requirement] 4121[:]1-5-10(D)(1)(a).
>
> [Three] The finger clearance for Mr. Scott was improperly checked.
>
> [Four] Not only were the pullbacks not properly adjusted for Mr. Scott, they were improperly adjusted for Mr. [LaGanke]. This is egregious behavior on the part of [LaGanke].
>
> [Five] The usefulness of the guard over the foot pedal was destroyed by Mr. [LaGanke's] demonstrating press operation while keeping his fot [sic] always on the foot pedal instead of removing it from the pedal and moving it outside of the guard after each power stroke. This is tantamount to removing the foot pedal guard and is thus a violation of [Specific Safety Requirement] 4121:1-5-10(C)(3)(a).
>
> [Six] These unsafe acts of [LaGanke] and the violations of the Specific Safety Requirements caused the incident in which Mr. Scott was injured.

{¶ 34} 17. The record contains a third report from Harkness dated June 4, 2013. In this three-page type-written report, Harkness begins by stating that the June 4, 2013 report "is to augment and amplify my preliminary report dated May 17, 2013."

{¶ 35} 18. It is not clear whether LaGanke's counsel was also handed the June 4, 2013 Harkness report just prior to the August 14, 2013 hearing before the SHO. The June 4, 2013 report is not mentioned by LaGanke's counsel at the hearing. Unlike the May 17, 2013 report, the June 4, 2013 report addresses relator's claim that LaGanke Stamping violated former Ohio Adm.Code 4121:1-5-10(C)(3)(a) regarding foot pedals.

{¶ 36} 19. At the August 14, 2013 hearing, LaGanke was examined by his counsel on direct examination. Initially, LaGanke was asked to explain what happened with a Greg Ramsey who LaGanke had endeavored to train on the power press at issue earlier that day before he trained relator on the same power press. Ultimately, after allowing Ramsey to do a test run on the machine, LaGanke sent Ramsey back to the temporary employment agency.

{¶ 37} 20. LaGanke testified how he trained Ramsey and set him up to run the press. The following exchange is recorded:

He came in. I quizzed him a little bit. We went through the whole safety procedure. I checked him off on the pullbacks by, what I do is I bring the presses down to within three-quarters, half an inch, where your fingers can just fit underneath, and I check them from the side. I usually measure using my own hands over theirs.

I show them how to put it on. I then take it off. I have them put it on, push all the way in, I then put my hand over it and make the measurement. From here to here is two and an eighth inches (indicating.)

Q. Wait a minute. "From here to here," for the record what do you mean?

A. What I do is when they have their hand in, I put my hand over theirs, I'm on the side here, I'm never on the right side, I'm on the left side, that's where the control button is at, and I check to make sure that from the tip of this finger to here (indicating) --

Q. The first joint?

A. -- the first joint is past where their finger is. That gives them two inches. He was standing about three inches, but actually OSHA, the OSHA regulations say two inches, and that's what they come in for. If you go too far over that, they're not happy about that because I get complaints because the guys' hands get jerked.

He was -- I then checked him off on that.

(Tr. 37-38.)

{¶ 38} 21. LaGanke then testified how he endeavored to train and set up relator on the power press at issue. The following exchange is recorded:

Q. Okay. And then Mr. [Scott] showed up around ten was it?

A. * * * And right the first thing I started asking him was his experience. I pointed out the presses, I said "Did you run this type of press?"
And he said "Yes."

I said "Have you used," these are called "Sargents pullbacks?"

By the way, I do have a Bachelor's of mechanical engineering, I've been running those presses for over 40 years, I am a tool and die maker, and I also am a prior officer of the military.

Q. Okay. Now, after you had the discussion about his experience, did you actually sit him down at the press and check him out on the pullbacks?
A. Yes. Well, the first thing I did was I went there, just like I normally do, and I went through the procedure, which is this is the pullbacks, he was wearing this type right here. What you do is you show him how to run it.

I go through this a couple of times with each hand. You put your whole hand through the first loop, four fingers through the second, it goes just like this. This has got to be to the outside. The strap right here is to be tightened around your wrist. This is to the outside. (Indicating.) I go through that procedure a couple times. I don't sit down. I always stand. The whole hand through the first one, four fingers through the second, the thumb's got to be in the middle. I do that with the left and right.

Q. So this loop, this metal loop on this strap --

A. -- is to the overhead, it's an overhead pullback device sold by Sargents.

Q. All right. So when the ram comes down, tell the Hearing Officer how it works, the ram coming down.

A. There's gearing. First off, the ram's chain is attached to the front of the press, and as it comes down, the gearing up there multiplies the effect of the distance. So as the distance comes down, it starts pulling you back, it pulls you back like about two, two and a quarter times for the distance that it travels. So, in other words, if it goes down one inch, it pulls back two and a quarter inches. You have an adjustment with a bar you can adjust and that adjusts in and out. You also have the chain which you can pull down and that will pull back more or less.

Q. With regard to Mr. Scott, Chuck, did you adjust the pullbacks to fit him specifically?

A. What I did is I had adjusted them for myself before he got there, and knowing he was coming I set -- I already set the height of the press to about three-quarters of an inch, so

when he got there it was already at pinchpoint. In other words, pinchpoint is where it has to have his hand fully out at least two inches in order to keep his hands from being crushed, and I already had it down to that point. So after demonstrating how to put those on, I didn't touch the press, it wasn't running.

I then had him come over and put them on and just to make sure he knew how to put them on. He was to demonstrate to me he could do it, and at that point he put his hands in like this (indicating.)

Q. Wait a minute. When you say "like this," you have to explain it for the record.

A. He had the wrist pullbacks on, and he was pushing forward like this (indicating.) I told him to push harder. He pushed harder, as hard as he could, leaning forward, and at that point in time I put my hand over his, the one that was the nearest, and I checked the distance and it was past the joint on my finger, so it was over two inches.

Q. Did you in any way adjust or in any way demonstrate to Mr. Rhoulac Scott anything differently than you did with Mr. Ramsey or anybody else?

A. No, I gave him the same speech about not using powered equipment, watch for any bolts that fell off the press, things like that.

Q. Okay. So the next question would be if we have the pullout adjustment records for that day, I don't see RS initials on here. Why not?

A. That's because I told him, I said I didn't have my pocket protector with me, I had left it -- actually I left it in the restroom, I didn't want to say that. I said "I have it in the office. I'll be right back. Just wait a minute."

Q. Okay. When you say your pocket protector, what's the significance of that?

A. The pocket protector has my pen, my scale, which is a six inch measurement, light –

Q. Okay. This --

A. -- pencils.

Q. -- pullout adjustment record is part of the press, is this actually hanging on the press?

A. Yes; yes, I have 14 press pullbacks and they're hanging on all the presses. They're inspected once a month, and they were added on that press after the press was purchased for a safety improvement.

Q. Okay. So with regard to the timing of everything, after you got done demonstrating the pullbacks and adjusting them for Mr. Scott, how much time elapsed before the incident occurred?

A. Just minutes.

(Tr. 40-44.)

{¶ 39} 22. During the August 14, 2013 hearing, John Wronski was called to testify by counsel for LaGanke Stamping. Wronski was employed by LaGanke Stamping as a die setter operator at the time of the accident at issue. He was running a press some 15 to 20 feet away from relator at the time of the accident. Counsel asked Wronski how LaGanke set him up on his press the morning of the accident. The following exchange is recorded:

Q. * * * in the morning when you came in to work that machine, were you checked out on the machine?

A. Yes.

Q. By whom?

A. Chuck [LaGanke].

Q. And would you explain to the Hearing Officer how that is done?

A. Stick your hand -- you know, Chuck brings the machine down about three-quarters of an inch from the bottom of the die, which is the pinchpoint. Thereafter I will stick my hands in like the stirrups, and stretch them out as far as I can, and they have to be at least two inches always from that pinchpoint, and then he'll bring the press back up and then he'll sign his name and then I'll sign my name.

(Tr. 66.)

{¶ 40} 23. During the August 14, 2013 hearing, Allen Coleman was called to testify by counsel for LaGanke Stamping. On the date of the injury at issue, Coleman was employed by LaGanke Stamping as a "setup man." The following exchange is recorded:

Q. Okay. Did you make a determination or come to some kind of a decision as to how it happened?

A. Yeah, because I seen people put pullbacks on wrong, you know, I make sure that they put them on right, because you get more room if you don't hook it up right. You're supposed to wear it like this (indicating) so when the cable is on and your hands are out, and you make sure you got distance up here where before, you know, when it is coming down that it don't cut you, you know.

Q. Okay. So "like this," you've got one loop around your wrist and the other loop around all four fingers?

A. Yeah.

Q. But not the thumb?

A. Yeah.

Q. All right. And what did you determine as far as the cause of the accident?

A. Well, he had to have it on backwards, you know, wrong, it would give you all kind of room to get up in the press like that, you know.

Q. Okay. And if he wore it -- now, what you have is you've got this one strap around your wrist and the other strap around your left thumb, but not around the fingers?

A. Right, so you got room, it give [sic] you extra room to get up in the press and, you know.

Q. Now, if you wore the strap like that, the wrong way, would that jerk your fingers at an angle?

A. Yeah.

Q. Okay.

A. It will pull you back, because this is -- like snatch you up like that, but it's not right. You need the whole pullback, you

got to have it on like this so that it snatches you back, yeah, not to the sideways.

Q. If it snatches you to the side, it actually puts part of your fingers into the pinchpoint?

A. Puts you up in there.

Q. Now, what we just talked about isn't anything that you saw, but this is what you surmised?

A. Yes, because we checked the machine and did all kind of stuff to try to determine, because the pullbacks was [sic] working and everything was setting right, I couldn't get it in.

Q. All right. So --

A. And so when I showed him, you know, that there's a different way, if you put the strap on wrong you've got more room and, you know, there it was.

Q. Okay. So you, after the incident, you tried to get the machine to reproduce the accident?

A. Yep.

Q. And you couldn't do it?

A. Charlie couldn't figure it out, and I come down and worked with him and I told him I've seen -- you know, I've been working on them and accidentally put it on wrong, but I changed it around, you know, I'm not going to make a hit with my hand up in there, I put the part in and take my hand out and hit the pedal.

(Tr. 79-81.)

{¶ 41} 24. Following the August 14, 2013 hearing, the SHO issued an order denying relator's VSSR application. The SHO's order explains:

On 10/19/2011 the Injured Worker was employed by Lakeland Employment Group of Cleveland, a temporary employment agency. On that date he was sent to LaGanke and Sons Stamping Co. to work as a press operator. The Injured Worker was assigned to operate an electric full revolution power press. Mr. LaGanke, the owner of the stamping company, indicated that the press was purchased by the company in the 1950s. The press was equipped with

pull back guards. Mr. LaGanke instructed the Injured Worker on how to wear the guards and how to operate the press. A few minutes after the Injured Worker began operating the press he suffered an amputation of a portion of three fingers of his right hand.

The parties are in agreement that any claim for a violation of a specific safety requirement should be pursued against LaGanke and Sons. This is because the stamping company controlled the manner and means of performing the work to which the Injured Worker was assigned.

* * *

The Injured Worker has cited Code Section 4121:1-5-10(D)(1)(a) and 4121:1-5-10(C)(3)(a). These Code Sections became effective on 08/01/77. They, therefore, are not applicable to an injury caused by a machine that was put into service in the 1950s. The applicable safety requirements are those contained in Bulletin No. 203 which became effective on 01/01/1951.

Code Section 4121:1-5-10(D)(1)(a) requires that an employer provide and require the usage of point of operation guards or properly applied and adjusted point of operation devices for every operation performed on a mechanical power press. The Injured Worker alleges that the pull back guards on the press he operated were not properly adjusted thereby causing his injury. The requirement concerning pull back guards in Bulletin No. 203, Chapter VII, is that every press in use shall be constructed or provided with effective safety devices so that the fingers or hands of an operator are prevented from entering the danger zone at the time of operation. Pull guards are to be designed and adjusted so that no part of the operator's hand may remain between the dies during more than one-half of the down stroke. Mr. LaGanke testified that when he trained the Injured Worker on how to use the press he made sure that the pull backs were adjusted so that the Injured Worker's fingers were at least two inches from the danger zone at the time of the down stroke. Mr. LaGanke stated that he taught the Injured Worker how to wear the wrist guards properly and that he measured the Injured Worker's reach to verify that at least two inches clearance was present. The Hearing Officer finds, based on this testimony, that the guards were present and properly adjusted at the time the Injured Worker began work on the machine. There is insufficient evidence to establish that they were not properly adjusted when the Injured Worker was

injured only a few minutes after the training session. The Hearing Officer, therefore, finds that there has not been a showing of a violation of Chapter VII of Bulletin No. 23 [sic] with regard to this issue.

Section 1-5-10(C)(3)(a) requires that all foot pedals on mechanical presses be protected to prevent unintended operation of the press by falling or moving objects or by a person accidentally stepping on the pedal. This provision became effective on 08/01/1977. It, therefore, is also inapplicable to the Injured Worker's injury as the press in question was put into service in the 1950s. The applicable requirement would be set forth in Bulletin No. 203, Chapter VII which became effective on 01/01/1951. Bulletin No. 203 does not contain any safety requirement regarding foot pedals on mechanical presses. It only addresses treadles on hammers. The Hearing Officer, therefore, finds that there has been no showing of a violation of the applicable safety requirement with regard to the foot pedal. The Hearing Officer also finds, based on the testimony of Mr. LaGanke, Mr. Wronski and Mr. Coleman that the foot pedal in question was guarded and could not be operated accidentally by a falling or moving object or by a person accidentally stepping on the pedal.

The Hearing Officer finds that there has been no showing of a violation of a specific safety requirement. The application is denied.

{¶ 42} 25.  Relator moved for rehearing pursuant to Ohio Adm.Code 4121-3-20(E). In his memorandum in support of rehearing, relator appears to concede that the relevant administrative rule at issue is found at Chapter VII of Bulletin No. 203, which was published by the Industrial Commission of Ohio, effective January 1, 1951.

{¶ 43} 26.  On December 12, 2013, another SHO mailed an order denying relator's request for rehearing.  The order explained:

It is hereby ordered that the Motion for Rehearing filed 10/28/2013 be denied. The Injured Worker has not submitted any new and relevant evidence nor shown that the order mailed 10/04/2013 was based on an obvious mistake of fact or on a clear mistake of law.

Conclusions of Law:

{¶ 44} Several issues are presented: (1) whether the commission abused its discretion by allegedly failing to consider the reports of relator's expert which are not mentioned nor discussed in the SHO's order of August 14, 2013; (2) whether the commission was precluded from finding compliance with the safety rule when LaGanke used his own hand as a measuring tool to determine the appropriate finger clearance at the press; (3) whether it must be found that LaGanke adjusted the pullback guards for himself and not the relator; and (4) whether LaGanke's alleged failure to fully comply with the safety manual appended to the May 17, 2013 Harkness report precluded the commission from finding that LaGanke had properly set up relator on the press.

### The Safety Rules

{¶ 45} Chapter 4123:1-5 of the Ohio Adm.Code currently provides rules for workshop and factory safety.

{¶ 46} Ohio Adm.Code 4123:1-5-01 is captioned "Scope and definitions."

{¶ 47} Ohio Adm.Code 4123:1-5-01(A) captioned "Scope," provides:

> Installations or constructions built or contracted for prior to the effective date (shown at the end of each rule) of any requirement shall be deemed to comply with the provisions of these requirements if such installations or constructions comply either with the provisions of these requirements [or] with the provisions of any applicable specific requirement which was in effect at the time contracted for or built.

{¶ 48} Ohio Adm.Code 4123:1-5-10 is captioned "Mechanical power presses."

{¶ 49} Ohio Adm.Code 4123:1-5-10(C) is captioned "Mechanical power press guarding."

{¶ 50} Thereunder, Ohio Adm.Code 4123:1-5-10(C)(3) currently provides:

> Foot pedals (treadle).
>
> (a) Pedal mechanism.
>
> The pedal mechanism shall be protected to prevent unintended operation from falling or moving objects or by accidental stepping onto the pedal.

{¶ 51} Ohio Adm.Code 4123:1-5-10(D) is captioned "Safeguarding the point of operation."

{¶ 52} Thereunder, Ohio Adm.Code 4123:1-5-10(D)(1) is captioned "General requirements."

{¶ 53} Thereunder, Ohio Adm.Code 4123:1-5-10(D)(1)(a) currently provides:

> It shall be the responsibility of the employer to provide and require the usage of "point of operation guards" or properly applied and adjusted "point of operation devices" on every operation performed on a mechanical press.

{¶ 54} It can be observed, that, effective November 1, 2003, Ohio Adm.Code 4123:1-5-10 replaced Ohio Adm.Code 4121:1-5-10.

{¶ 55} It can be further observed that the current versions of Ohio Adm.Code 4123:1-5-10(C)(3)(a) and (D)(1)(a) read the same as the versions of Ohio Adm.Code 4121:1-5-10(C)(3)(a) and (D)(1)(a) that were in effect immediately prior to November 1, 2003.

{¶ 56} It can be further observed that, in support of his VSSR application, relator cited to former Ohio Adm.Code 4121:1-5-10(C)(3)(a) and 4121:1-5-10(D)(1)(a) as the specific safety rules claimed to have been violated.

{¶ 57} Notwithstanding relator's citation to specific safety rules found under former Ohio Adm.Code 4121:1-5-10, the SHO found that the applicable safety requirements are found in Bulletin No. 203 which became effective January 1, 1951. A copy of the relevant portions of Bulletin No. 203 is appended to the brief of respondent.

{¶ 58} Section 47 of Bulletin No. 203 is captioned "Power Presses and Drop Hammers—Guarding." Thereunder, Section 47 provides:

> Except where the operator uses both hands out of the danger zone to hold the stock while the operation is performed, every press in use shall be so constructed or provided with effective safety devices so that the hands or fingers of the operator are prevented from entering the danger zone at the time of operation.
>
> The following methods of guarding are acceptable:
>
> 1. Manual feed presses, by:
>
> * * *
>
> (e) Pull guard or two-hand tripping devices (Secs. 52 and 54)

{¶ 59}  Section 52 is captioned "Pull Guard."

{¶ 60}  Thereunder, Section 52 of Bulletin No. 203 provides:

> a. A pull guard is a device operated by the ram and attached below the Pittman screw so that movement of the ram will pull the operator's hand or hands from the area between the punch and the die.
>
> b. Pull guards are acceptable only where ram stroke is three (3) inches or more.

{¶ 61}  Section 57 of Bulletin No. 203 provides:

> If the press is safeguarded by a movable guard or by a two-hand tripping device, or by a pull guard, the guard or device shall be so designed and adjusted that no part of the operator's hand may remain between the dies during more than one-half (1/2) of the down stroke.

### First Issue

{¶ 62}  In denying the VSSR application, the SHO's order of August 14, 2013 fails to mention or discuss the reports of relator's expert, Richard Harkness.  However, the order indicates substantial reliance on the hearing testimony of LaGanke.  Reliance is also placed on the hearing testimony of Wronski and Coleman.

{¶ 63}  It is well settled that the commission must specifically state evidence on which it relies and briefly explain the reasoning for its decision.  *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), syllabus.  The commission need not cite evidence it has considered and rejected, nor must it explain why it finds certain evidence to be unpersuasive.  *State ex rel. DeMint v. Indus. Comm.*, 49 Ohio St.3d 19, 20 (1990) citing *State ex rel. Mitchell v. Robbins & Myers, Inc.*, 6 Ohio St.3d 481 (1983).

{¶ 64}  Because the commission does not have to list the evidence considered, the presumption of regularity that attaches to commission proceedings, *State ex rel. Brady v. Indus. Comm.*, 28 Ohio St.3d 241 (1990), gives rise to a second presumption—that the commission indeed considered all the evidence before it.  *State ex rel. Lovell v. Indus. Comm.*, 74 Ohio St.3d 250, 252 (1996).  That presumption, however, is not irrebutable. *Id.*

{¶ 65} Here, in the SHO's order of August 14, 2013, the SHO states reliance on the hearing testimony of LaGanke, Wronski, and Coleman. It does not state that the reports of relator's expert were considered, nor does it explain why the expert's reports were found to be unpersuasive. Nor does well-settled law require the commission to do so.

{¶ 66} Citing *State ex rel. Scouler v. Indus. Comm.*, 119 Ohio St.3d 276, 2008-Ohio-3915, relator endeavors to rebut the presumption of regularity. Relator also misquotes from the *Scouler* case. According to relator's brief, the *Scouler* court stated: "[I]f the commission cites to evidence before it, but omits a particular document from that recitation, then reviewing courts will presume that the commission overlooked the document." (Relator's Brief, 13.) Clearly, the *Scouler* court did not make the statement relator attributes to it here. Nor does relator correctly state well-settled law.

{¶ 67} Relator's reliance upon *Scouler* is misplaced. *Scouler* does not compel relator's conclusion that the commission failed to consider the reports of relator's expert.

{¶ 68} In *Scouler,* the commission denied temporary total disability ("TTD") compensation to Dennis C. Scouler after January 27, 2005 on grounds that the medical evidence of his disability was lacking. In September 2005, Scouler applied for TTD compensation retroactive to January 27, 2005. In support, Scouler submitted several C-84s from his treating physician, Dr. Paul R. Gutheil, and an October 7, 2005 questionnaire completed by Dr. Gutheil. On it, Dr. Gutheil responded yes to two queries:

> At the time of your evaluation of Mr. Scouler on February 4, 2005, did you feel that he still remained disabled from his original position of employment as a fork lift operator?
>
> Based on a reasonable medical probability, do you feel that his work restrictions related to this injury have been in effect limiting him in his employment capabilities continuously for the period of October 21, 2004 through the present time?

*Id.* at ¶ 5-6.

{¶ 69} In denying Scouler's request for TTD compensation, an SHO found an "insufficiency of the medical evidence." *Id.* at ¶ 8. Acknowledging a C-84 from Dr. Gutheil dated October 4, 2005, covering the period from September 20 to November 18, 2005, the SHO concluded: "[T]here is no C-84 to cover the period of time from 01/27/2005 to 09/19/2005." *Id.*

{¶ 70} In granting the writ, the *Scouler* court was concerned about the commission's lack of reference to Dr. Gutheil's questionnaire.

{¶ 71} Acknowledging that "[u]nder most circumstances, such an omission would be inconsequential," *Id.* at ¶ 15, the *Scouler* court nevertheless explains:

> When the commission, for whatever reason, elects to list all evidence before it, but omits a particular document from that recitation, we will presume that the document was overlooked. *State ex rel. Fultz v. Indus. Comm.* (1994), 69 Ohio St.3d 327, 329, 1994 Ohio 426, 631 N.E.2d 1057. If that document could influence the outcome of the matter in question, we will return the matter to the commission for further consideration. Id.
>
> The order now at issue does not contain an actual itemized list of the evidence as *Fultz* did. Nevertheless, the order states, "All relevant evidence was reviewed and considered." In addition, the order did discuss all of the evidence presented except for Dr. Gutheil's questionnaire. We consider this to be significant, because the tenor of the commission's order is that there is no evidence that certifies disability before September 20, 2005. But Dr. Gutheil's responses do allege disability prior to that date, so it is important that the commission also consider that document.

*Id.* at ¶ 16-17.

{¶ 72} Again, relator's reliance on *Scouler* is misplaced.

{¶ 73} Other than the fact that the reports of relator's expert are not mentioned in the SHO's order of August 14, 2013—a fact to be expected when the reports are not found to be persuasive—there is no other observation to be made to suggest that the reports were overlooked or not considered. There is nothing in the *tenor* of the order to suggest that the reports of relator's expert were not considered.

{¶ 74} Relator also cites to *State ex rel. Donohoe v. Indus. Comm.,* 10th Dist. No. 08AP-201, 2010-Ohio-1317, in his attempt to rebut the presumption of regularity. Relator's reliance upon *Donohoe* is misplaced.

{¶ 75} Patrick Donohoe ("decedent") died from injuries sustained in a workplace accident. His injuries resulted from his fall at a construction project. Decedent's widow filed an application for a VSSR award. There was a factual dispute as to the location from which decedent fell and the distance he fell. There were no eyewitnesses to the fall.

{¶ 76} In an ambiguous order, the commission, through its SHO, denied the VSSR application. Consequently, decedent's widow filed a mandamus action in this court. This court granted the writ. An appeal as of right was then taken to the Supreme Court of Ohio.

{¶ 77} As this court noted in its decision, the parties had submitted competing expert reports reconstructing the circumstances of decedent's fall. *Id.* at ¶ 7.

{¶ 78} Following a June 19, 2007 hearing, an SHO issued an order denying the VSSR. In the order, the SHO emphasized that no one saw the decedent fall and concluded that the decedent's widow "can not prove" a VSSR violation. *Id.* at ¶ 11. As indicated by this court in its decision, the commission's order omitted any reference to the various expert reports. *Id.* at ¶ 23.

{¶ 79} On the appeal to the Supreme Court of Ohio, this court's judgment was affirmed. *State ex rel. Donohoe v. Indus. Comm.,* 130 Ohio St.3d 390, 2011-Ohio-5798. The Supreme Court explains:

> The difficulty in this case, as the court of appeals accurately observed, is that the SHO's order—from an evidentiary standpoint—can be interpreted in different ways. *Id.* at ¶ 21. The order contained the boilerplate "all evidence was reviewed and considered," leading the appellate magistrate to assume that the SHO had indeed evaluated the evidence and was not persuaded by the widow's version of events. *Id.* at ¶ 22, 45. The court of appeals acknowledged that language, but found that other language in the order cast doubt on the true extent of evidentiary review. *Id.* at ¶ 26.
>
> The court based its conclusion on two things: (1) the SHO's preoccupation with the lack of eyewitnesses to the fall and (2) her declaration that the widow "can not" prove her case. To the court of appeals, the focus on eyewitness testimony could be explained only by the SHO's mistaken belief that such evidence was legally required to prove a VSSR. *Id.* at ¶ 24. Only the belief in that per se rule, the court continued, would justify the SHO's conclusion that the widow "can not"—as opposed to "did not"—carry her burden of proof. Id. If the SHO had so believed, then she would have had no reason to review the rest of the evidence. *Id.* at ¶ 25.
>
> An order that can engender two viable, yet irreconcilable, interpretations is too ambiguous to withstand scrutiny, and one that is potentially based on an erroneous belief that a

VSSR cannot be proved in the absence of eyewitnesses is clearly an abuse of discretion. *See, e.g. State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.,* 98 Ohio St.3d 134, 2002 Ohio 7089, 781 N.E.2d 170, ¶ 69. (The court "has never required direct evidence of a VSSR. To the contrary, in determining the merits of a VSSR claim, the commission or its SHO * * * may draw reasonable inferences and rely on his or her own common sense in evaluating the evidence"). The court of appeals was therefore correct in returning the cause to the commission for clarification and consideration of all the evidence if the SHO did not do so previously.

*Id.* at ¶ 17-19.

{¶ 80} The only resemblance between the *Donohoe* case and the instant one is that the commission's order at issue omits any reference to the report of an expert. That, in itself, is not enough to show an abuse of discretion. As noted, the commission is ordinarily not required to cite evidence it has considered and rejected, nor must it explain why it finds certain evidence to be unpersuasive.

{¶ 81} In *Donohoe,* the order at issue suggested that the commission erroneously believed that a VSSR cannot be proven in the absence of eyewitnesses. Here, relator has failed to point out how the absence of reference to the reports of relator's expert suggests in any way that the commission operated under an erroneous belief in rendering its decision. Clearly, relator's reliance on *Donohoe* is misplaced.

{¶ 82} The magistrate concludes that the commission is entitled to the presumption that it considered the reports of relator's expert.

### Second Issue

{¶ 83} As noted earlier, LaGanke testified at the hearing that he used his finger as the measuring device to determine the appropriate finger clearance.

{¶ 84} As earlier noted, regarding his training of Greg Ramsey on the press, LaGanke stated:

I have them put it on, push all the way in, I then put my hand over it and make the measurement. From here to here is two and an eighth inches (indicating.)

{¶ 85} As earlier noted, regarding his training of relator on the press at issue, LaGanke stated:

A. He had the wrist pullbacks on, and he was pushing forward like this (indicating.) I told him to push harder. He pushed harder, as hard as he could, leaning forward, and at that point in time I put my hand over his, the one that was the nearest, and I checked the distance and it was past the joint on my finger, so it was over two inches.

According to relator:

Common sense dictates that an employer's hand is not a proper measuring tool for determining an employee's reach. The employer should actually use a measuring tool for measuring distances, as measurements must be exact to prevent serious injury.

(Relator's Brief, 15.)

{¶ 86} The magistrate disagrees with relator's argument.  As he testified on questioning from the hearing officer, LaGanke had previously measured his own finger:

THE HEARING OFFICER:  Mr. Laganke, have you measured your own hand?

MR. LAGANKE: Yes.

THE HEARING OFFICER: That's how you know?

MR. LAGANKE: That's how I know, yes.

(Tr. 64.)

{¶ 87} While the SHO did not directly address in the order whether or not it was improper for LaGanke to use his own finger as a measuring device, it can be presumed that the SHO did not find a problem with this.  Moreover, relator points to no administrative rule prohibiting such.  The magistrate disagrees with relator's assertion that common sense dictates a different finding.

### Third Issue

{¶ 88} The third issue is whether it can be found that LaGanke adjusted the pullback guards for himself and not the claimant.

{¶ 89} In his brief, relator asserts:

At the SHO hearing, the Employer's owner - LaGanke - testified that he only adjusted the pullback guards for himself during his training session with Scott. LaGanke also

testified that he properly determined the adjustment length for the pullback guards by using his own hand as a measuring tool. According to LaGanke, it was not necessary for him to actually adjust the crank mechanism of the pullback to fit Scott's arm length.

(Relator's Brief, 15.)

{¶ 90} The relevant testimony from LaGanke regarding relator's assertion occurred during the following exchange, as previously noted:

Q. With regard to Mr. Scott, Chuck, did you adjust the pullbacks to fit him specifically?

A. What I did is I had adjusted them for myself before he got there, and knowing he was coming I set -- I already set the height of the press to about three-quarters of an inch, so when he got there it was already at pinchpoint. In other words, pinchpoint is where it has to have his hand fully out at least two inches in order to keep his hands from being crushed, and I already had it down to that point.

(Tr. 42-43.)

{¶ 91} LaGanke explained in his testimony why it was not necessary for him to adjust the pullbacks or, as relator puts it here, "to actually adjust the crank mechanism." (Relator's Brief, 15.)  It was well within the commission's fact finding discretion to find that LaGanke did not fail to properly set up relator at the press.

### Fourth Issue

{¶ 92} The fourth issue is whether LaGanke's alleged failure to fully comply with the safety manual appended to the May 17, 2013 Harkness report precluded the commission from finding that LaGanke had properly set up relator on the press.\

{¶ 93} As earlier noted, appended to the Harkness report is a safety manual published by The Positive Safety Mfg. Co. in June 1968.  The manual provides a procedure for finger clearance.  It provides for "an opening of not less than 3/4 [inches] between the lower edge of the punch and the top of the die or work, whichever is higher."  It also provides "there must be a distance of at least 3 [inches] from finger tips to the pinch point."

{¶ 94} Relator argues that LaGanke failed to follow the procedure for finger clearance as provided in the safety manual.

{¶ 95} As respondent insightfully points out here, Bulletin No. 203, Section 47 does not adopt the finger clearance procedure of any safety manual, including the one provided by relator's expert.   Thus, that LaGanke used two inches as the minimum requirement is not necessarily a violation of Bulletin No. 203, Section 47.

## Conclusion

{¶ 96} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).